*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JONATHAN CHRISTOPHER JONES,

Defendant-Appellant.

FOR PUBLICATION
July 10, 2025
3:15 PM

No. 362854
Macomb Circuit Court
LC No. 2018-000644-FC

Before: MALDONADO, P.J., and BOONSTRA and WALLACE, JJ.

MALDONADO, P.J.

Defendant appeals as of right his jury-trial convictions of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). Defendant was sentenced to life imprisonment without parole for the felony-murder conviction and a concurrent term of 15-45 years' imprisonment for the child-abuse conviction. We affirm.

## I. FACTS

Defendant's convictions arise from the death of IY on May 4, 2017, when she was four years old. Defendant lived with IY's mother, Amanda Yurkus, along with IY and her two siblings, EY and KY. Defendant and Yurkus divided childcare duties to accommodate their work schedules. In general, one parent watched the children while the other parent worked.

While defendant was watching the children on May 3, 2017, he discovered that IY lost consciousness. At the hospital, physicians discovered that IY was experiencing rapid internal bleeding and shock from severe internal abdominal injuries. Physicians tried to surgically repair the damage, but IY's blood loss and resulting shock were too advanced. Chantel Njiwaji, M.D., of the Wayne County Medical Examiner's Office, performed a postmortem examination of IY's remains. Dr. Njiwaji found that IY's cause of death was blunt force trauma to the abdomen, which transected the superior mesenteric vein, the blood vessel that drains blood from major abdominal organs. Dr. Njiwaji also found that IY sustained bruises to her face, back, and buttocks. She determined that all of IY's injuries were sustained at the same time, within 12 to 24 hours of death. According to Dr. Njiwaji, the transection of the mesenteric vein would have immediately caused IY to show signs of severe distress. Dr. Njiwaji concluded that the manner of death was homicide.

-1-

Law enforcement officers and the prosecutor determined that defendant was the perpetrator because IY was in his care before she fell unconscious.

Before trial, defendant's counsel requested a *Daubert*[1] hearing to challenge the scientific basis of Dr. Njiwaji's opinion regarding the age of the bruises. However, defendant's successor counsel, Nicole Castka, subsequently withdrew the motion. The prosecutor gave notice that she intended to introduce evidence of defendant's prior acts of child abuse under MCL 768.27b. The other-acts evidence included evidence that IY told an emergency room (ER) nurse in June 2016 that defendant hit her. Defendant moved to exclude this evidence. In a pretrial hearing, the trial court ruled that the prosecutor could introduce much of the other-acts evidence.

At trial, the prosecutor's theory was that defendant punished IY with a physical beating severe enough to inflict the internal injuries. The prosecutor's trial evidence came within three categories: testimony that defendant had a history of physically disciplining the children; expert testimony regarding the timing and cause of IY's injuries; and EY's and Yurkus's testimony regarding the events leading up to the discovery of IY's injuries on May 3, 2017. The defense theory was that Dr. Njiwaji erred in dating IY's injuries, which were actually sustained within days, not hours, of her death. Defendant's expert, Ljubisa Dragovic, M.D., testified that microscopic examination of tissue samples revealed that IY's internal injuries had been in a healing process for several days when IY lost consciousness. Therefore, Dr. Dragovic opined that the injuries were not inflicted on May 3, 2017. The jury found defendant guilty of felony murder and first-degree child abuse.

Defendant sought remand from this Court primarily on the basis that the trial court erred by admitting the other-acts evidence of prior abuse and that defendant was denied the effective of counsel when his trial counsel withdrew the *Daubert* motion. This Court granted defendant's motion for a remand to the trial court for a *Ginther*[2] hearing. *People v Jones*, unpublished order of the Court of Appeals, entered March 1, 2024 (Docket No. 362854).

At the *Ginther* hearing, Castka testified that she withdrew the *Daubert* motion because Kris Sperry, M.D., the physician who wrote a report in support of excluding Dr. Njiwaji's testimony, was uncooperative. Castka also testified that she wanted to pursue a strategy of shifting blame to Yurkus or EY, but defendant would not allow this. She, therefore, deferred to his decision. After the hearing, the trial court denied plaintiff's motion for a new trial. This appeal followed.

## II. EVIDENTIARY ISSUES

Defendant argues that the trial court erred in admitting evidence of prior instances in which he allegedly abused IY and her siblings. We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v*

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[2] *People v Ginther*, 390 Mich 43; 212 NW2d 922 (1973).

*Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019); see also MRE 103(a)(1).[3]  A party's pretrial motion in limine is sufficient to preserve a claim of evidentiary error.  See *People v Vansickle*, 303 Mich App 11, 117-118; 842 NW2d 289 (2013) (reviewing evidentiary issue raised in motion in limine as a preserved issue).  Defendant preserved this issue with respect to evidence that he used corporal punishment with IY and EY, and with respect to evidence that he was responsible for an incident that caused IY to be hospitalized in 2016.  However, he did not preserve this issue with respect to evidence that his infant daughter, KY, had unexplained bruises.[4]

A trial court's decision to admit evidence is reviewed for an abuse of discretion.  *People v Propp*, 508 Mich 374, 383; 976 NW2d 1 (2021).  A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes.  *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017).  "[W]hether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo."  *Propp*, 508 Mich at 383.

"Unpreserved evidentiary issues are reviewed for plain error affecting substantial rights . . . ."  *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022).  To demonstrate plain error, the defendant must satisfy three requirements: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights."  *Id*. (quotation marks and citation omitted).  "A defendant must, in relevant part, show that the error affected the outcome of the proceedings or intrinsically undermined the fairness, integrity, or public reputation of the proceedings."  *Id*. at 109.

## A.  RULES OF EVIDENCE

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  MRE 401.  Generally, "[a]ll relevant evidence is admissible . . . ."  MRE 402.  However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  MRE 403.  Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[a]ll relevant and material evidence is prejudicial[.]"  *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018).  Rather, "[i]t is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded."  *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).  This involves a two-part test: "First, this Court must decide whether introduction of [the] evidence at trial was unfairly prejudicial.  Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair

---

[3] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024.  See 512 Mich lxiii (2023).  Analysis of evidentiary issues in this opinion will follow the version of the rules in effect at the time of trial.

[4] Though related to other-acts evidence and prior abuse, defendant raises this particular issue in the context of ineffective assistance of counsel, which we address later.

prejudice." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citation omitted).

The version of MRE 404(b)(1) in effect at the time of trial provided:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

When a party intends to offer evidence of other wrongful acts, the trial court must consider: "(1) whether the evidence is offered for a proper purpose under MRE 404(b), (2) whether the evidence is relevant under MRE 401 and MRE 402, and (3) whether the probative value of the evidence is substantially outweighed by unfair prejudice under MRE 403." *People v Roscoe*, 303 Mich App 633, 645-646; 846 NW2d 402 (2014). However, MCL 768.27b provides:

> Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, sexual assault, or a violation of chapter LXVII or chapter LXVIIA of the Michigan penal code, 1931 PA 328, MCL 750.448 to 750.462 and 750.462a to 750.462h, evidence of the defendant's commission of other acts of domestic violence, sexual assault, or acts constituting violations of chapter LXVII or chapter LXVIIA of the Michigan penal code, 1931 PA 328, MCL 750.448 to 750.462 and 750.462a to 750.462h, is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

 "MCL 768.27a irreconcilably conflicts with MRE 404(b), which bars the admission of other-acts-evidence for the purpose of showing a defendant's propensity to commit similar acts . . . ." *People v Watkins*, 491 Mich 450, 455; 818 NW2d 296 (2012). On that point, our Supreme Court held in *Watkins*, *id*. at 475, that "MCL 768.27a is a valid enactment of substantive law to which MRE 404(b) must yield."

"Hearsay 'is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' " *People v Smith*, 336 Mich App 79, 110; 969 NW2d 548 (2021), quoting MRE 801(c). "Under MRE 802, hearsay is not admissible unless it falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence." *People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013) (quotation marks and citation omitted). MRE 803(4) provides an exception to admit statements made for the purpose of obtaining medical treatment. The version of MRE 803(4) in effect at the time of trial provided an exception for:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or

external source thereof insofar as reasonably necessary to such diagnosis and treatment.

## B. EVIDENCE OF 2016 HOSPITALIZATION

Defendant takes issue with several strands of evidence related to IY's prior hospitalization. First, Yurkus and Mindy Hirst, an ER nurse, both testified about an incident in June 2016 when defendant called an ambulance because he found IY unresponsive when she was in his care. Defendant argues that this evidence was inadmissible to prove that IY's prior medical emergency resulted from defendant's prior abuse. We disagree.

Our Supreme Court held in *Watkins*, 491 Mich at 487:

[W]hen applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect. That is, other-acts evidence admissible under MCL 768.27a may not be excluded under MRE 403 as overly prejudicial merely because it allows a jury to draw a propensity inference.

However, the Court in *Watkins* identified "several considerations that may lead a court to exclude such evidence." *Id*. at 487. The Court stated:

These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Id*. at 487-488.]

The court made findings that correspond to the first (similarity), second (temporal proximity), and sixth (lack of other available evidence) factors of the *Watkins* analysis, 491 Mich at 487-488. The trial court found that the proffered evidence was "relevant to showing a pattern of behavior on defendant's part," namely because the evidence demonstrated "that defendant physically disciplined the children, and that on more than one occasion IY, the younger and smaller child, sustained a bruise after an event of physical discipline." The court acknowledged that "the instant charges reflect a much more serious beating that resulted in IY's death," but concluded that "there are sufficient similarities such that the currently charged conduct demonstrates an aggravation of the other alleged acts of domestic violence." The court noted that the 2016 incident occurred only 11 months before defendant's charged conduct. The court further noted that there was "a need for evidence beyond the testimony of the parties involved" because IY was deceased and defendant had not waived his right to silence. The record supports these findings.

Moreover, in addition to the similarity described by the trial court, the incidents also were similar in that they both occurred while defendant was alone and "in charge" of the children. Additionally, defendant's and Yurkus's attempt to explain the 2016 incident is another factor weighing in favor of admission. This consideration does not clearly come within any of the factors enumerated in *Watkins*, but the list is not exhaustive. See *id*. Defendant and Yurkus told medical

staff that IY fainted because she was dehydrated and suffering from heat stroke, but this explanation was not corroborated. A reasonable inference is that defendant and Yurkus fabricated an explanation to conceal abuse.

Regarding the fifth *Watkins* factor (lack of reliability), defendant argues that evidence relating to the 2016 hospitalization was unreliable because the related Children's Protective Services (CPS) investigation found no evidence of abuse. However, the CPS report recording the investigators' findings is an out-of-court statement that defendant offers to prove the truth of the matter asserted, and is, therefore, hearsay. MRE 801(c). Moreover, defendant stipulated that CPS reports and investigations would not be admitted. "[A] party may not harbor error at trial and then use that error as an appellate parachute." *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010). In any event, the outcome of the 2016 CPS investigation is not definitive proof of defendant's innocence.

Defendant also argues that the trial court committed reversible error in admitting Hirst's testimony that IY identified defendant as the perpetrator of the 2016 incident. We disagree.

IY's statement that defendant hit her was an out-of-court statement offered to prove the truth of the matter asserted, and was therefore hearsay under MRE 801(c). However, MRE 803(4) provides an exception to admit statements made for the purpose of obtaining medical treatment. This rule provided at the time of the 2022 trial:

> **Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection with Treatment.** Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment. [MRE 803(4).]

In *People v Duenaz*, 306 Mich App 85, 96; 854 NW2d 531 (2014), this Court held that a child's identification of an abuser can be relevant to obtaining medical treatment because the physician "can assess and treat any pregnancy or sexually transmitted disease, make referrals for other treatment, including counseling, and structure the examination to the exact type of trauma the child recently experienced." *Id*. (quotation marks and citation omitted). "The doctor can also assess whether the child will be returning to an abusive home." *Id*. "Generally, identification of the assailant can be as important to the health of the child as treatment of the physical injuries that are apparent to the physician." *Id*. at 96-97 (quotation marks and citation omitted). Although *Duenaz* involved sexual abuse, the assessment of the safety of the child's home is also relevant to nonsexual physical abuse, as occurred in this case.

In *People v Meeboer*, 439 Mich 310, 324; 484 NW2d 621 (1992), our Supreme Court held that when a child's hearsay statement is offered under the medical-treatment exception, the trial court should conduct an "inquiry into trustworthiness" that takes into consideration "the totality of circumstances surrounding the declaration of [the child's] out-of-court statement." *Id*. at 324. "While the inquiry into the trustworthiness of the declarant's statement is just one prong of the analysis under MRE 803(4), it is very important that the understanding to tell the truth to the physician be established." *Id*. The Court stated:

Factors related to trustworthiness guarantees surrounding the actual making of the statement include: (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Id*. at 324-323 (citations omitted).]

The trial court applied the *Meeboer* factors in this statement:

Although IY's age at the time of the statement weighs against the trustworthiness of the disclosure, the remainder of the limited evidence presented weighs in favor of trustworthiness. Here, there is no evidence that IY's mother asked a leading question to prompt the disclosure; the terminology of the disclosure is simple and consistent with language that a three-year old would use to make a voluntary, truthful disclosure; there was no prosecutorial involvement at the time the disclosure was made; at the time of the statement, IY had recently been admitted to the emergency department [and] was being treated for lethargy and a facial bruise that was causing pain; there is no evidence that IY could have mistaken defendant, her "daddy" as someone else; and there is no evidence suggesting that IY had any motivation to fabricate the allegation. Thus, based on the totality of the evidence presented at this time, the Court finds that IY's statement is sufficiently trustworthy to be admitted under MRE 803(4) despite her young age.

We find this analysis partially unsatisfactory because the court did not consider whether IY understood the importance of speaking truthfully to the care provider. *Id*. at 324. The trial court also did not refer to Yurkus's testimony that Hirst asked IY the question multiple times until IY named defendant. Under these circumstances, there is a close question regarding whether the trial court properly found that the statement was admissible under MRE 803(4). However, the trial court's decision regarding a close evidentiary question generally does not constitute an abuse of discretion. *Thorpe*, 504 Mich at 252. Moreover, even if the statement was erroneously admitted, defendant fails to establish a miscarriage of justice warranting reversal. See *People v Gursky*, 486 Mich 596, 619; 786 NW2d 579 (2010); MCL 769.26.

Finally, defendant argues that a mistrial was necessary to cure the impermissible inclusion of evidence regarding the 2016 hospitalization—particularly Hirst's testimony that she initiated procedures to submit a Form 3200 report of suspected abuse to CPS.[5] We disagree.

A trial court's decision on a motion for mistrial is reviewed for abuse of discretion. *People v Boshell*, 337 Mich App 322, 335; 975 NW2d 72 (2021). "A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Caddell*, 332 Mich App 27, 37; 955 NW2d 488 (2020) (quotation marks and citation omitted). The parties stipulated to exclude "any evidence of testimony regarding [CPS] records or investigations that occurred prior to this incident . . . ." The parties agreed, "There may be mention of CPS involvement or whatever by witnesses, but nothing regarding records or prior investigations." Hirst's reference to a Form 3200 submission did not refer to either a CPS record or an investigation.[6] Therefore, the trial court correctly concluded that the parties' stipulation did not extend to Hirst's statement and did not abuse its discretion in denying defendant's motion for a mistrial. See *Boshell*, 337 Mich App at 335.

## C. EVIDENCE OF PRIOR CORPORAL PUNISHMENT

Applying the factors from *Watkins*, defendant argues that the prior incidents of physical discipline described by EY at trial were not similar to the charged offense. We find these arguments unconvincing.

At trial, the prosecutor elicited EY's testimony that defendant gave IY a "whooping" before she lost consciousness. He stated that by "whooping" he meant that IY was "getting hit on the butt" with defendant's hand. Defendant sometimes gave EY "whoopings" when he got into trouble for fighting at school, including an incident when he was expelled from school. EY did not remember if defendant hit him with anything other than his hand, but after using the preliminary examination's transcript to refresh his memory, he stated that defendant used a belt a few times.

This evidence of defendant's propensity to use physical punishments was probative of whether he physically punished IY on May 3, 2017. Evidence that the previous punishments involved beatings by hand and beatings with a belt was probative of defendant's propensity to escalate the violence of the punishments. Accordingly, we do not believe that the trial court abused its discretion in weighing the similarity factor in the prosecutor's favor. EY's testimony established an overall pattern of defendant's willingness to inflict physical punishments against very young children.

---

[5] Michigan's child protection law, MCL 722.621 *et seq*., requires certain persons to report suspected child abuse or child neglect, MCL 722.723, and authorizes other persons to do so, MCL 722.624. The Department of Health and Human Services has provided DHS-3200 as a mechanism for such reporting.

[6] Moreover, the reference to the Form 3200 was incidental to the other, admissible evidence related to the 2016 hospitalization.

Defendant argues that the third *Watkins* factor, frequency, weighs against admission because the only specific incident EY recalled was when he was expelled from school for fighting. This argument does not accurately characterize EY's testimony. When asked "what kind of bad things would you do that you would get in trouble for[,]" EY stated: "Like, sometimes I would get into a fight at school and then get expelled. I think one time that happened." EY's reply could be construed as conveying that there were multiple times when defendant punished him for fighting in school, but only one occasion when EY was expelled. EY's testimony recalls multiple punishments for fighting in school and at home. Whether these incidents were "frequent" is a subjective evaluation, but one that the trial court could reasonably make in favor of admission.

Defendant further argues that the reliability factor weighs against admission because EY's testimony was not corroborated by any other eyewitness and because EY's memory was poor. While these factors might affect the weight the trier of fact gives to the testimony, they do not objectively establish that the testimony was unreliable. Additionally, defendant did not argue that EY was incompetent to testify about past abuse. A witness is incompetent to testify if he lacks physical or mental capacity, or a sense of obligation to testify truthfully and understandably. MRE 601. A witness is not permitted to testify regarding a matter unless the witness has personal knowledge of the matter. MRE 602. Defendant did not argue that EY's faulty memory made him an incompetent witness under MRE 601, or that EY no longer had personal knowledge under MRE 602. Defendant, therefore, cannot argue that the trial court misjudged the reliability of EY's testimony for reasons that defendant failed to demonstrate in the trial court. Accordingly, we will not disturb the trial court's decision to admit the evidence because defendant fails to establish an abuse of discretion. See *Propp*, 508 Mich at 383.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant makes several arguments on appeal that his trial counsel provided ineffective assistance. We do not find any of the arguments persuasive.

## A. KY'S BRUISES

As noted, defendant argues that trial counsel's failure to object to Yurkus's testimony about KY's bruises constitutes ineffective assistance of counsel. We disagree.

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id.* To establish ineffective assistance of counsel, a defendant first must demonstrate that trial counsel's performance fell below an objective standard of reasonableness. *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011). "Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable." *Id.* at 290.

To satisfy the first prong of ineffective assistance of counsel, this Court must consider "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022) (quotation marks and citation omitted). To establish the second prong, defendant must

establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019) (quotation marks and citation omitted). When evaluating claims of ineffective assistance of counsel, a defendant must overcome the strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

This Court will not substitute its judgment for that of trial counsel regarding matters of trial strategy or assess counsel's competence with the benefit of hindsight. *Traver*, 328 Mich App at 422-423. "Yet a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "[A] court must determine whether the 'strategic choices [were] made after less than complete investigation,' and any choice is 'reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id*., quoting *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Counsel will be found ineffective if a strategic decision was not sound or reasonable. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). "The burden is on [the] defendant to establish the factual predicate for his claims." *People v Thurmond*, 348 Mich App 715, 741; 20 NW3d 311 (2023).

Yurkus testified that she observed bruises on KY many times after she had been in defendant's care. Yurkus had pictures documenting the bruises. Yurkus's testimony established an inference that defendant was abusive toward KY, or at least that he handled her roughly. That evidence is arguably admissible under MCL 768.27b and not subject to exclusion under MRE 403. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Accordingly, defendant fails to establish that trial counsel made an objectively unreasonable error in failing to object to this testimony, or that a timely objection would have led to a more favorable outcome.

## B.  STRATEGY OF SHIFTING BLAME

Defendant also argues that trial counsel was ineffective because she deferred to his instructions against pursuing a strategy of shifting blame to Yurkus or EY. We disagree.

In *McCoy v Louisiana*, 584 US 414, 417; 138 S Ct 1500; 200 L Ed 2d 821 (2018), the United States Supreme Court considered the tension that can arise between a defendant and trial counsel in matters of trial strategy. The defendant in *McCoy* was charged with three counts of premeditated murder. *Id*. at 418. The defendant wanted trial counsel to present an alibi defense and pursue an acquittal, but his trial counsel believed that this plan had no likelihood of success. *Id*. at 418-419. Moreover, trial counsel believed that jurors who heard the evidence against him would be more likely to vote for the death penalty. *Id*. Trial counsel thought that the jury might spare defendant the death penalty if the he conceded guilt and focused on appealing to the jury's mercy in view of his serious psychological problems. *Id*. at 420. Trial counsel conceded the defendant's guilt over his objections, but the strategy was unsuccessful, as the jury voted for the death penalty for all three murder counts. *Id*. The defendant argued in a motion for a new trial

and on appeal that the trial court violated his constitutional rights by allowing his trial counsel to concede his guilt over his objection. *Id.*

The United States Supreme Court began its analysis by stating that a defendant's "right to defend is personal, and a defendant's choice in exercising that right must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* at 421 (quotation marks and citations omitted). The Court stated further:

> The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta* [*v California*], 422 US [806,] 819-820; 95 S Ct 2525; [45 L Ed 2d 562 (1975)]; see *Gannett Co v DePasquale*, 443 US 368, 382 n 10; 99 S Ct 289; 61 L Ed 2d 608 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense"). Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Gonzalez v United States*, 553 US 242, 248; 128 S Ct 1765; 170 L Ed 2d 616 (2008) (internal quotation marks and citations omitted). Some decisions, however, are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. See *Jones v Barnes*, 463 US 745, 751; 103 S Ct 3308; 77 L Ed 2d 987 (1983). [*McCoy*, 584 US at 421-422 (first and fifth alterations in original).]

The Court further stated that "choices affecting conduct of the trial," including "the objections to make, the witnesses to call, and the arguments to advance," do not require the client's consent. *Id.* at 423 (quotation marks and citation omitted).

In this case, trial counsel admitted at the *Ginther* hearing that she believed focusing on Yurkus as the culpable parent was the best strategic choice, but she did not pursue that strategy because defendant would not allow it. She believed that she had to "abide by his decisions, even if [she] disagreed with them." Defendant emphasizes on appeal that the *McCoy* Court's statements that matters related to strategy and the conduct of trial are within the attorney's professional judgment. The prosecutor asserts that trial counsel was obligated to defer to defendant's right to maintain autonomy by asserting both his own innocence and Yurkus's innocence. Neither party cites caselaw supporting their respective applications of *McCoy*.

However, the United States Court of Appeals for the Eighth Circuit addressed the issue of an attorney's compliance with a client's instructions against her best professional judgment in *Taylor v Steele*, 6 F 4th 796 (CA 8, 2021).[7] In *Taylor*, the defendant insisted that his trial counsel not present a closing argument during the penalty phase of a capital-murder trial because it would

---

[7] Federal court of appeals decisions are not binding on this Court, but they may be considered persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004).

violate his religious belief against "ask[ing] for other men something they cannot give us or take from us," including his life. *Id*. at 799. The jury recommended the death penalty for each count of first-degree murder. *Id*. at 800. In the context of federal habeas proceedings, the defendant argued that "trial counsel had the ultimate decisionmaking power whether to give a closing argument during the penalty phase," and that counsel "erred by following his client's directive instead of deciding in the best interest of his client." *Id*. at 801-802. The Eighth Circuit held that "counsel may violate a defendant's right to autonomy by deciding certain fundamental decisions regarding the case without the defendant's ultimate authority . . . ." *Id*. at 802 (quotation marks and citation omitted). The court concluded, however, "[I]t does not follow that counsel violates a defendant's right to effective counsel by *yielding* to the defendant's ultimate authority in either a trial strategy or a fundamental decision." *Id*.

*Taylor* is a well-reasoned precedent that respects a defendant's right to set his own goals and priorities, and we find it persuasive. If a properly-informed defendant rejects a potentially beneficial strategy against counsel's advice, we can see no sound reason for granting him relief for trial counsel's failure to override his priorities, even if, in her professional judgment, the defendant is acting contrary to his or her own best interests. Accordingly, trial counsel's decision not to pursue a blame-shifting strategy was not an objectively unreasonable error under the first prong of the ineffective-assistance analysis. See *Leffew*, 508 Mich at 637.

Under the second prong of the analysis, defendant also fails to establish that he was prejudiced by trial counsel's failure to try shifting blame to Yurkus. See *id*. Although Yurkus gave testimony that supported the prosecutor's theory, she also professed her belief in defendant's innocence. If the defense theory focused on Yurkus as the perpetrator, it would have risked losing Yurkus's support for defendant. Additionally, Dr. Dragovic's testimony established a theory that IY sustained the injury days before May 3, 2017, thereby establishing a possibility that IY sustained the injury when she was not in defendant's care. This testimony suggested the possibility that Yurkus was the perpetrator, without the risks of directly focusing on her. Under these circumstances, defendant cannot demonstrate that trial counsel's compliance with his directive against a blame-shifting defense was an outcome-determinative error. See *id*.

Likewise, defendant fails to demonstrate a reasonable probability that he would have received a more favorable outcome if trial counsel had mitigated Hirst's testimony by offering evidence from the 2016 CPS report that IY's bruises were not indicative of abuse. Defendant has not provided an affidavit to verify that the doctor cited in the 2016 CPS report would have given favorable testimony. Moreover, even if admissible, evidence from the 2016 CPS report could only have countered the propensity aspects of the prosecutor's theory. It would have had no effect on testimony by Dr. Njiwaji that IY was forcefully assaulted hours before her presentation in the ER, nor the testimony by Yurkus and EY placing IY alone with defendant in circumstances suggestive of punishment. Defendant, thus, fails to establish this claim of ineffective assistance.

## C. WITHDRAWAL OF *DAUBERT* MOTION

Defendant further argues that trial counsel was ineffective when she withdrew the *Daubert* motion to exclude Dr. Njiwaji's testimony that all IY's bruises were sustained at the same time. We disagree.

The admission of expert testimony is governed by MRE 702 and MCL 600.2955. At the time of trial, MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Expert testimony related to the death of or injury to a person also is governed by MCL 600.2955. This statute applies to criminal proceedings, as well as civil cases. See *People v Spaulding*, 332 Mich App 638, 658-659; 957 NW2d 843 (2020). MCL 600.2955 provides:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.

> (b) Whether the opinion and its basis have been subjected to peer review publication.

> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

> (d) The known or potential error rate of the opinion and its basis.

> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

> (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

> (g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

> (2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

-13-

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012). The Court stated:

> Because there are many different kinds of experts and expertise, this inquiry is, by necessity, a flexible one, and a court determining the admissibility of expert testimony may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case. [*Id*.]

The Court in *Kowalski* outlined the factors the court must consider in fulfilling its gatekeeping duties:

> Whatever the pertinent factors may be, however, a court evaluating proposed expert testimony must ensure that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case. [*Id*.]

Defendant asserts that Dr. Njiwaji made a conclusive finding regarding the ages of IY's injuries based on a scientifically unsound method, namely microscopic inspection of only two samples. Dr. Sperry testified that examining a wide array of samples of injured tissue creates more data points and more points of comparison for determining a timeline of when injuries occurred. He stated that Dr. Njiwaji's opinion that the left cheek and buttock bruises occurred at the same time was "not accurate in anyway shape or form" because "that opinion is impossible to be derived based upon what she looked at." He also stated that Dr. Njiwaji failed to apply the established knowledge that coagulopathy changes the appearance of injuries. He explained:

> Because the bleeding will not slow down and stop normally in a normal fashion, because the proteins that go into forming the blood clot are not working right or is not enough of them, the degree, the extent, the size, the appearance all of the elements of the bleeding that you could see with the naked eye are exaggerated. They will get bigger and bigger because the blood is not clotting normally and that is an effect of the disturbance in the coagulopathy, not in the injury itself.

The trial court did not specifically address the question of whether defendant established in the *Ginther* hearing that Dr. Njiwaji's findings as to the age of the injuries was based on a scientifically unsound method, but it found that defendant's challenges to Dr. Njiwaji's methods were not supported by the record. We agree that Dr. Sperry's testimony and written opinion did not require the trial court to continue the *Daubert* hearing. Dr. Sperry's testimony established that examination of every bruise could be a better method, but not necessarily that Dr. Njiwaji's method was unacceptable. Dr. Njiwaji testified that there is no protocol from the National Association of Medical Examiners requiring microscopic examination of every bruise.

Furthermore, Dr. Sperry's critique of Dr. Njiwaji's methods addressed only a secondary aspect of Dr. Njiwaji's testimony. Dr. Njiwaji testified that the transection of the superior mesenteric vein was caused by a powerful blow to the abdomen within hours of IY's death. She

testified that ordinary childhood accidents, such as IY experienced in the week before her death, could not have caused the traumatic injuries. Therefore, even if Dr. Njiwaji had been precluded from testifying about the age of the bruises, her testimony regarding the internal injuries would still have placed the time of IY's injuries in the hours preceding her loss of consciousness. Defendant, therefore, fails to establish that trial counsel's withdrawal of the *Daubert* motion was an objectively unreasonable error or a reasonable probability of a more favorable outcome if the motion had continued. See *Leffew*, 508 Mich at 637.

## IV. CLOSURE OF COURTROOM DURING EY'S TESTIMONY

Defendant argues that the trial court violated defendant's constitutional right to a public trial when it granted the prosecutor's motion to close the courtroom during EY's testimony. We consider this issue waived.

A failure to object to an error constitutes "mere forfeiture of an error," but "affirmative approval constitute[s] a waiver." *People v McDonald*, 293 Mich App 292, 295; 811 NW2d 507 (2011). "Waiver" is defined as "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *Id*. at 217 (quotation marks and citation omitted). "It is presumed that waiver is available in a broad array of constitutional and statutory provisions . . . ." *Id*. at 217-218 (quotation marks and citation omitted). "While the defendant must personally make an informed waiver for certain fundamental rights such as the right to counsel or the right to plead not guilty, for other rights, waiver may be effected by action of counsel." *Id*. at 218. "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id*. at 215 (quotation marks and citations omitted).

Here, the action of trial counsel effected defendant's waiver of this issue. *See id*. at 218. At a pretrial hearing in December 2018, defendant's original trial counsel stated on the record that he did not object to closing the courtroom during EY's testimony. At trial in February 2022, before EY testified, the prosecutor stated for the record that the courtroom was closed. Defendant's successor trial counsel did not respond. Despite having plenty of time and multiple opportunities to recant his initial affirmative approval of closure, or to challenge the continuing validity of that approval, defendant remained silent. Moreover, at the *Ginther* hearing, defendant's successor trial counsel testified that she wanted the courtroom to be closed because she thought that it would be beneficial for defendant. We therefore conclude that this issue is waived.

## V. FELONY MURDER

Defendant argues that he cannot be convicted of first-degree murder and first-degree child abuse when both charges are based on the same, single act. According to defendant, the act of homicide and the act of child abuse were one and the same with the same intent, so there was no separate felony that could provide the predicate for a first-degree felony murder conviction. We disagree.

-15-

The child-abuse statute, MCL 750.136b(2) provides, "A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical harm or serious mental harm to a child." The first-degree murder statute defines felony murder, in relevant part, as "[m]urder committed in the perpetration of, or attempt to perpetrate, . . . child abuse in the first degree . . . ." MCL 750.316(1)(b). "The elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [MCL 750.316(1)(b) . . . ]." *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007) (quotation marks and citation omitted; alteration in original).

We have previously addressed defendant's argument that the Legislature did not intend the use of the same act to serve as both the predicate felony and the murder itself, with regard to felony murder. In *People v Magyar*, 250 Mich App 408; 648 NW2d 215 (2002), the defendant argued that his conviction of felony murder was improper because the predicate felony was first-degree child abuse, and both the murder and the predicate felony arose out of the same act, namely a blow to the skull of the victim that caused bleeding and swelling in her brain. *Id*. at 410. We held that the same act that constitutes the predicate felony can also constitute the felony murder because the language of the felony murder statute, MCL 750.316, clearly allows all murders committed in the perpetration or attempted perpetration of the enumerated felonies to be treated as first-degree murder. *Id*. at 412. Accordingly, a single act may support convictions for both first-degree child abuse and felony murder if the defendant acted with the requisite intent. *Id*. at 412-413.

The evidence presented at trial supported a finding that defendant abused IY in a manner that he must have known would create a high risk of death or great bodily harm. Dr. Njiwaji testified that IY must have been beaten with great force applied to the abdomen while her back was against a hard surface. An adult would know that such a severe beating created a risk of death or great bodily harm. Accordingly, the evidence supported defendant's convictions of both first-degree felony murder and first-degree child abuse, and reversal is not warranted.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Randy J. Wallace